IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| PAUL J. BLUNDELL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:03CV998 |
| | ) | |
| WAKE FOREST UNIVERSITY | ) | |
| BAPTIST MEDICAL CENTER, | ) | |
| UNIVERSITY OF NORTH CAROLINA | ) | |
| AT GREENSBORO, | ) | |
| SANDRA OUELLETTE, Director of | ) | |
| Nurse Anesthesia Program, JOHN DOES, | ) | |
| and JANE, 1 through 5, and NURSE | ) | |
| ANESTHESIA PROGRAM, | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OPINION

BEATY, District Judge.

I.      INTRODUCTION

Plaintiff Paul J. Blundell ("Plaintiff"), acting *pro se*, filed a Complaint in this matter to allege that he was illegally dismissed from the Nurse Anesthesia Program jointly administered by the University of North Carolina at Greensboro ("UNC-G") and Wake Forest University Baptist Medical Center ("Wake Forest"). On April 11, 2005, this Court granted Defendants' Wake Forest and Sandra Ouellette's ("Ouellette") Motion to Dismiss as to a number of Plaintiff's claims. Based upon that Order, the claims remaining against Defendants were these: Title IX of the Education Amendments of 1972 ("Title IX"), breach of contract, and violation of New

York Executive Law § 290-298 against Defendants Wake Forest and UNC-G, and a single claim of violation of New York Executive Law § 290-298 against Ouellette.[1]

Since the entry of that Order, a number of new motions have been filed. Defendant UNC-G has filed an additional Motion to Dismiss in Part [Document #48], while Defendant Wake Forest has filed a Motion for Partial Judgment on the Pleadings [Document #62]. All Defendants have filed Motions for Summary Judgment [Documents #80, #89]. Additionally, Defendants have filed Motions to Strike [Documents #71, # 72] Plaintiff's Amended Complaint [Document #70]; and Motions to Strike [Documents #94, #96] Plaintiff's audio recordings and transcript of such recordings, Plaintiff's addendum to his deposition, and other hearsay served with Plaintiff's Response to the Motions for Summary Judgment.

Plaintiff's Response to the Motions for Summary Judgment, as well as any audio recordings and the addendum to his deposition, did not appear to be timely filed with the Court. However, Plaintiff has filed a Motion to Allow Plaintiff to Resubmit Oppositions [Document #101] in which Plaintiff states that he mailed his Response to the Motions for Summary Judgment to the Court, but that the Response was damaged in transit by the U.S. Postal Service and was therefore never delivered to the Court. As such, Plaintiff states that he had no knowledge that his Response did not timely arrive at the Court until after Defendants filed a

---

[1] The Court dismissed Plaintiff's claims against all Defendants for alleged violations of Title VI of the Civil Rights Act of 1964, as amended ("Title VI"); Title VII, 42 U.S.C. § 2000e-2 ("Title VII"); the anti-retaliation provisions of the Family and Medical Leave Act, 29 U.S.C. § 2615 ("FMLA"); and the Age Discrimination in Employment Act of 1975 ("ADEA").

2

Reply to the Response which Plaintiff was able to successfully mail to Defendants.

Finally, Plaintiff has also filed a Motion to Toll and Provide Equitable Relief [Document #50], in which he seeks an extension of time to file as to his ADEA and Title VII claims, which this Court has already dismissed.

Before detailing the factual background in this matter and considering the Motion to Dismiss, the Motion for Partial Judgment on the Pleadings, and the Motions for Summary Judgment, the Court will address the procedural posture of this case, including: (1) Defendants' Motions to Strike Plaintiff's Amended Complaint, (2) Plaintiff's Motion to Toll and Provide Equitable Relief, (3) Plaintiff's Motion to Resubmit his Opposition to Defendants' Motions for Summary Judgment, and (4), Defendants' Motions to Strike various parts of Plaintiff's Response to their motions.

II.    PROCEDURAL MOTIONS

A.    Defendants' Motions To Strike Plaintiff's Amended Complaint

Defendants' seek to strike Plaintiff's Amended Complaint [Document #70] for the following reasons: (1) Plaintiff did not file a motion to amend with the Court prior to his filing the Amended Complaint as required under Federal Rule of Civil Procedure 15(a); (2) Plaintiff did not seek to extend the deadline to file an amended pleading and as such his filing of the Amended Complaint on July 28, 2005 was about four weeks after the July 1, 2005 deadline set for filing amended pleadings in the May 18, 2005 scheduling order [Document #59]; (3) Plaintiff's amendments are futile because he seeks to add claims that have already been dismissed by this

3

Court, including claims under Title VI, Title VII, and the ADEA; and, finally, (4) because Plaintiff seeks to add claims not included in his original complaint that are barred for other procedural and statutory reasons.

The Court has examined Plaintiff's Amended Complaint and finds that Plaintiff did not comply with the May 18, 2005 scheduling order, which set a July 1, 2005 deadline for Plaintiff to seek leave to file an amended complaint or to join additional parties.[2] Accordingly, the Court will GRANT Defendants' Motions to Strike [Documents #71, #72] Plaintiff's Amended Complaint [Document #70].

B.      Plaintiff's Motion To Toll And Provide Equitable Relief

As previously stated, this Court has already dismissed Plaintiff's claims under ADEA and Title VII as untimely filed. The Court found that both statutes require that a claimant bring suit within ninety days after receipt of the Notice of Right-to-Sue letter from the EEOC. 42 U.S.C.

---

[2] The Court also finds that Plaintiff's proposed amendments would be futile, see Davis v. Piper Aircraft Corp., 615 F.2d 606, 613 (4th Cir. 1980), and so may be disallowed. Plaintiff seeks to add claims that have already been dismissed, that is, Title VI, Title VII, and ADEA. He also seeks to add a claim under the North Carolina Retaliatory Employment Discrimination Act ("REDA"), N.C. Gen. Stat. § 95-241, a claim under the North Carolina Equal Employment Practices Act ("NCEEPA"), N.C. Gen. Stat. § 143-422.1, and a claim for common law defamation. The REDA claim would be futile because Plaintiff did not participate in the administrative proceeding required by the statute. N.C. Gen. Stat. § 95-242. Plaintiff's claim under NCEEPA would be futile because North Carolina courts have consistently held that there is no private right of action based upon the public policy concerns stated in NCEEPA. See, e.g., Royster v. Costco Wholesale Corp., 378 F. Supp. 2d 595, 607-08 (M.D.N.C. 2005). Finally, Plaintiff's claim for common law defamation would be futile because under North Carolina law, a defamation claim must be brought within one year of publication. Plaintiff complains of incidents occurring between 1999 to 2001.

4

§ 2000e-5(f)(1); 29 U.S.C. § 626(e). In this case, Plaintiff received notice from the EEOC of his right to sue on July 31, 2001. Accordingly, the Court found that because Plaintiff did not file his lawsuit until September 18, 2003, more than ninety days passed between his receipt of a right-to-sue letter and the filing of this lawsuit, and as such both claims were untimely filed.

Subsequent to this ruling, Plaintiff filed his Motion to Toll and Provide Equitable Relief Under ADEA and Title VII [Document #50]. In that Motion, Plaintiff appears to ask the Court to reconsider that ruling, and allow his ADEA and Title VII claims to proceed because he was allegedly lulled into inaction by the various governmental offices and agencies in which Plaintiff sought review, particularly the U.S. Health and Human Services Office for Civil Rights ("HHS"). Plaintiff states that even though he received a right-to-sue letter from the EEOC, Plaintiff was confused by the ongoing investigation by HHS.

In response, Defendants Wake Forest and Ouellette argue that "equitable tolling" is a "narrow limitations exception." Olson v. Mobil Oil Corp., 904 F.2d 198, 201 (4th Cir. 1990). More specifically, Defendants state that the Fourth Circuit has limited equitable tolling to instances where an "employee's failure to timely file results from either a 'deliberate design by the employer or actions that the employer should unmistakably have understood would cause the employee to delay filing his charge.'" Id. In this case, Defendants note that Plaintiff makes no such allegations against Defendants, and instead that Plaintiff blames various governmental agencies for lulling him into inaction despite a right-to-sue letter from the EEOC that clearly

5

advised Plaintiff of the 90-day requirement.[3]

The Court finds that Plaintiff cannot credibly argue that he was lulled into inaction after receiving this EEOC letter. Plaintiff makes no allegations that any governmental official, whether connected with the EEOC or with HHS, instructed Plaintiff that he should not timely pursue any federal lawsuit under Title VII or the ADEA. See Bledsoe v. Pilot Life Ins. Co., 473 F. Supp. 864, 867 (M.D.N.C. 1978) (refusing equitable tolling where plaintiff pursued a wage and hour violation but did not similarly pursue a Title VII claim and stating that "one should not view 'the federal government' as a single entity in discrimination cases. . . . Actions (or inaction) by the Wage and Hour Division cannot be imputed to others."). Accordingly, the Court finds that equitable tolling in this case is inappropriate. Plaintiff's Motion to Toll and Provide Equitable Relief [Document #50] is therefore DENIED.

C.    Plaintiff's Motion To Resubmit Oppositions To Motions For Summary Judgment

Plaintiff states that he mailed his documents to both opposing counsel and the Court on December 29, 2005. On January 3, 2006, the U.S. Postal Service returned to Plaintiff as damaged[4] the packages that he had mailed to opposing counsel, but not the package mailed to the Court.

_____

[3] The notice Plaintiff received from the EEOC stated: "Title VII, the Americans with Disabilities Act, and/or the Age Discrimination in Employment Act:   This will be the only notice of dismissal and of your right to sue that we will send you.  You may file a lawsuit against the respondent(s) under federal law based on this charge in federal or state court.  Your lawsuit **must be filed WITHIN 90 DAYS of your receipt of this Notice**; otherwise your right to sue based on this charge will be lost." (Emphasis in original.)

[4] Plaintiff submitted a letter written by a U.S. Postal Service supervisor attesting to this fact, that his packages were damaged by the U.S. Postal Service and so they had to be re-sent.

6

Thereafter, Plaintiff reconstructed his filings and re-mailed the packages to opposing counsel. Plaintiff states that he did not know that the Court did not receive his Response to the Motions for Summary Judgment until after Defendants Wake Forest and Ouellette filed a Reply stating that their Motion should be treated as unopposed due to Plaintiff's failure to file a Response with the Court.[5] Plaintiff seeks to resubmit copies of documents with the Court that he originally mailed on December 29, 2005.

The Court finds that Plaintiff's failure to file his Response to the Motions for Summary Judgment with the Court constitutes excusable neglect, see Fed. R. Civ. P. 6, and will therefore GRANT Plaintiff's Motion to Allow Plaintiff to Resubmit Oppositions [Document #101], and will consider Plaintiff's Response in opposition to Defendants' Motions for Summary Judgment.

D.     Defendants' Motions To Strike Parts Of Plaintiff's Response To Motions For Summary Judgment And His Attachments

Defendants have filed Motions to Strike [Documents #94, #96] several attachments to Plaintiff's Response, including audio recordings, incomplete transcripts of those recordings, Plaintiff's "addendum" to his deposition and other hearsay statements by Plaintiff. Defendants seek to strike these attachments under Local Rule 7.3 and Federal Rules of Civil Procedure 12(f), 30(e), and 56(e). Plaintiff has, in fact, not responded to this set of Defendants' motions. The Court will consider each of these documents in turn.

---

[5] In the event that the Court would consider Plaintiff's late filings, Defendants also discussed the substance of Plaintiff's filings in their Reply. The Court finds that, therefore, Defendants are not unduly prejudiced by the Court's consideration of Plaintiff's late-filed Response to Defendants' Motions for Summary Judgment.

7

a. Plaintiff's Addendum To His Deposition

Defendants argue that Plaintiff's Errata Sheet changes to his deposition were not made in compliance with Rule 30(e) of the Federal Rules of Civil Procedure. Rule 30(e) provides in pertinent part as follows: "If requested by the deponent or a party before completion of the deposition, the deponent shall have 30 days after being notified by the officer that the transcript or recording is available in which to review the transcript or recording and, if there are changes in form or substance, to sign a statement reciting such changes and the reasons given by the deponent for making them."

Defendants argue that Plaintiff's errata changes were improper for several reasons. First, Defendants state that there is nothing in the record to indicate that Plaintiff's errata sheet was prepared within 30 days of the date that the transcript was made available for his review; instead, it appears that the changes were made after, and in direct response to, Defendants' Motions for Summary Judgment. Second, Defendants argue that Plaintiff has not provided any reason for the changes, nor did he swear under oath as to the truth of these changes. Third, Defendants argue that Rule 30(e) should not be interpreted to allow a deponent to materially alter what was said under oath, because a deposition is "not a take home examination." See Greenway v. International Paper Co., 144 F.R.D. 322, 325 (W.D. La. 1992).

The Court has examined Plaintiff's "addendum" and found Defendants' arguments concerning its impropriety and his failure to comply with the Federal Rules of Civil Procedure to be well taken. Accordingly, the Court will GRANT Defendants' Motions as it relates to this

8

addendum or errata sheet and will not consider it further.

    b. Plaintiff's Audio Recordings And Uncertified Transcripts of These Recordings[6]

    Defendants have also moved to strike pursuant to Rules 56(e) and 12(f) of the Federal

Rules of Civil Procedure certain audio recordings, uncertified transcripts of these recordings, and

other evidence that Plaintiff has submitted along with his Response to the Motions for Summary

Judgment. Rule 56(e) requires that a party adverse to a motion for summary judgment must

present supporting affidavits or other forms of admissible evidence in order to defeat summary

judgment. Defendants argue that all of these items are inadmissible because Plaintiff failed to

submit them to Defendants during discovery. Plaintiff failed to produce this evidence during

discovery even though Defendants had all requested copies of any recordings or transcripts of

such recordings related to Plaintiff's allegations as a part of their written discovery requests, and

even though Defendants specifically asked Plaintiff about the existence of tapes during his

deposition and he responded that he would provide such tapes, if available. Discovery in this

case ended on October 30, 2005. Plaintiff did not serve these tapes on Defendants until January

3, 2006.

    The Court finds that Plaintiff clearly did not comply with the discovery rules by failing

---

[6] While the Court herein grants Defendants' Motions to Strike Plaintiff's audio recordings
because Plaintiff failed to turn over these documents during the discovery process, the Court has
in fact listened to all of Plaintiff's audio recordings and does not find that the contents materially
impact the Court's decision concerning Defendants' Motions for Summary Judgment. The
Court does not find any evidence on the recordings to create an inference of gender
discrimination by Defendants.

to provide these tapes and associated transcripts to Defendants during the discovery period. Accordingly, Defendants' Motions to Strike these audio recordings and uncertified transcripts of such recordings will be GRANTED and the Court will not consider them further.

### c. Plaintiff's Submission of Other Hearsay Evidence

Defendant UNC-G in particular has also moved to strike two pages of Plaintiff's Response to the Motions for Summary Judgment for improperly including hearsay evidence. More specifically, Defendant UNC-G seeks to strike on page 5 of Plaintiff's Response statements attributed to "Dr. Tobin" and on page 6 of Plaintiff's Response statements attributed to "Ms. Wilson." Plaintiff did not seek to verify these statements by submitting an affidavit by either Dr. Tobin or Ms. Wilson. Accordingly, the Court will GRANT Defendant UNC-G's Motion to Strike these portions of Plaintiff's Response to the Motions for Summary Judgment and will not consider these statements further.

To sum up, the Court will GRANT in whole Defendants' Motions to Strike [Documents #94, #96]. Having now disposed of several procedural motions before the Court, the Court will now recite a statement of the facts at issue that are properly before the Court.

## III.   FACTUAL BACKGROUND

As is proper when considering motions to dismiss and motions for summary judgment, this Court will consider the admissible facts in a light most favorable to the non-moving party, which in this case is the Plaintiff. As previously stated, this action arises out of Plaintiff's former status as a graduate student in a two-year Nurse Anesthesia Program ("NAP") that is jointly

10

administered by Wake Forest and UNC-G. Defendant Ouellette is the Program Director for the NAP. Student registered nurse anesthetists ("SRNAs") in this program must complete both didactic classes at UNC-G and clinical classes at Wake Forest. Additionally, students must rotate to surrounding community hospitals to gain a variety of clinical practice. At each rotation, students are evaluated by the Certified Registered Nurse Anesthetists ("CRNAs"). SRNAs are dismissed from the UNC-G graduate nursing program upon earning a "C" in more than six semester hours of course work or a "C" in any nursing specialty class, such as the clinical practice classes taught at Wake Forest.

Plaintiff began as an SRNA in the NAP in August of 1999. Plaintiff, a New York resident, received a scholarship to attend the program, and also received funding from the State of New York's Department of Labor because he was an unemployed worker. In the Spring of 2000, Plaintiff received a "C" in a three-hour required course offered at UNC-G. He was then notified that if he received another "C" during any of the remaining four semesters, he would be automatically dismissed from the Graduate School at UNC-G. Additionally, in the Spring of 2000, Plaintiff missed getting a "C" in a nursing specialty course by one point. At the same time, CRNAs at Wake Forest had rated some areas of Plaintiff's clinical performance as "unacceptable." Based upon all of these issues, Defendant Ouellette notified Plaintiff in May of 2000 that he would have to appear before the Executive Committee at Wake Forest in order for the committee to review Plaintiff's progress and decide whether he should continue in the NAP, be placed on probation, or face dismissal. At the May meeting of the Executive Committee,

11

Plaintiff was allowed to present evidence in his defense. Ultimately, while the committee expressed reservations with Plaintiff's performance, he was allowed to continue in the NAP and was not placed on probation. Students on probation are not allowed to rotate outside of Wake Forest for clinical practice. In deciding not to put Plaintiff on probation, Plaintiff's advisors were concerned that denying Plaintiff the opportunity to participate in rotations would be detrimental to Plaintiff's clinical development.

However, Plaintiff continued to perform poorly in the clinical setting. On October 30 and 31, 2000, CRNA Robin Chaves supervised Plaintiff in the heart room at Wake Forest. Chaves noticed numerous inadequacies in Plaintiff's clinical performance. More specifically, Chaves noticed that Plaintiff was grossly disorganized and did not prepare for the procedure as she had previously instructed him. Chaves also reported that Plaintiff prepared the wrong amounts of medicines and did not have the necessary instrumentation available despite her instructions on which equipment to use. Chaves, in her written evaluation of Plaintiff, wrote that she "was shocked at Paul's behaviors/incompetence" and "was quite frankly afraid to let him touch anything." In response to this report, Defendant Ouellette sent Plaintiff a letter asking to meet with him and to implement an Action Plan to help Plaintiff complete the NAP. Plaintiff, however, argues that Chaves was biased against him in making her evaluation.

Ouellette met with Plaintiff on November 13, 2000. In response to that meeting, Plaintiff signed a document that reviewed a number of Plaintiff's "unacceptable" clinical evaluations and set out a "Plan of Action." Plaintiff was instructed that he was to receive no more "unacceptable"

12

or "needs improvement" ratings on his evaluations; he was to note satisfactory performance until the end of the semester; he was cautioned that inability to perform at a level expected of a senior student would result in a probable dismissal from the program; and he was told that "issues related to patient safety . . . can result in immediate dismissal." (Def. Wake Forest's Mot. Summ. J., Appendix, Document #90, Ex. 8.)

On November 17, 2000, Plaintiff had another serious incident in the heart room at Wake Forest. Prior to a cardiothoracic surgery, Plaintiff failed to check a machine to ensure that it was fully operational. Such a machine check is a basic procedure, and a critical task emphasized early on in a SRNA's clinical training and mastered within the early weeks of clinical rotation. Because of this machine's failure, Plaintiff was unable to ventilate a patient during a critical time of the surgery. As a result, the supervising CRNA and an anesthesiologist had to intervene to prevent imminent and grave injury to the patient. Plaintiff admitted that the error was his, both orally right after the incident and in a letter to Wake Forest.

Based upon this event in the heart room, Defendant Ouellette again convened the Executive Committee to evaluate Plaintiff. Plaintiff was given an opportunity to present evidence to the committee, and in fact, did so. Plaintiff's written response to the committee stated the following: "On Friday during my clinical rotation I failed to perform a critical step (high pressure machine check) an [sic] placed my patient at risk through my fault. [The anesthesiologist] had to step in and extricate the patient from this situation that I placed my patient into . . . Fortunately the patient suffered no ill effects from my lapse in the established

13

routine due totally to [the anesthesiologist's] competent handling of the situation . . . I was

fortunate that no ill effects befell my patient." (Def. Wake Forest's Mot. Summ. J., Appendix,

Document #90, Ex. 12.) After the Executive Committee reviewed all the evidence, the

committee unanimously voted to dismiss Plaintiff from the NAP for unsafe clinical practice, lack

of regard for patient safety, and failure to progress.

Plaintiff appealed his dismissal by the Executive Committee at Wake Forest to the

Grievance Committee at Wake Forest. The Grievance Committee met on January 5, 2001.

Plaintiff was again given the opportunity to present evidence in support of staying in the NAP.

The Grievance Committee unanimously upheld Plaintiff's dismissal from the NAP. Plaintiff

then appealed the decision of the Grievance Committee to Kevin A. Myatt, Vice-President of

Human Resources at Wake Forest. Mr. Myatt reviewed the evidence concerning Plaintiff's

dismissal from the NAP and subsequently affirmed the decisions of the Executive and Grievance

Committees.

After Plaintiff was dismissed from the NAP, Plaintiff contacted UNC-G's School of

Nursing. Plaintiff was told that he could pursue a masters in nursing in a different concentration

or he could reapply to the NAP after a semester hiatus. Plaintiff chose not to pursue either of

these options. According to Defendants, at no point during any of the hearings related to his case

did he allege that he had been discriminated against because of his age or gender.[7]

---

[7] After reviewing Plaintiff's audio recordings in this matter, the Court also agrees that
Plaintiff did not, during these hearings, allege that he had been discriminated against because of
his gender.

14

Plaintiff has not filed any witness affidavits, nor did he take any depositions during the discovery period. However, Plaintiff has maintained throughout this litigation that Defendant Ouellette told him that "older students do have problems in this program." Plaintiff alleges that Defendant Ouellette "manipulated" his grades to indicate a "less than passing average." Plaintiff further alleges that other students called him an "Old Fart," in the presence of instructors. Plaintiff states that he complained to Ouellette about the treatment of several instructors, who allegedly used his age and gender against him, and that he repeatedly asked for "remediation," or extra help, but that none was ever provided. Plaintiff alleges, without any evidence, that younger, female students were provided remediation that Defendants denied to him.

Plaintiff states that CRNA Chaves berated and humiliated him "at every opportunity," and that Chaves stated, "If you weren't here then I wouldn't have to be." Plaintiff states that, in contrast to Chaves, many other instructors rated him as "average" or "above average." Plaintiff alleges that failure of pressure machine in the heart room was not his fault because "the manufacturer has since stated that the machine drain plug cannot loosen spontaneously." Plaintiff appears to believe that someone loosened the machine drain plug on purpose in order to implicate him. Plaintiff also complains that Defendants did not turn over to him patient case records or allow him access to the anesthesia machine for which he failed to check the pressure.

Plaintiff states that he has a witness, "Ms. Wilson," who would testify that she had seen in the past negative treatment by Defendants of older and male students and characterized this as "castigations." Plaintiff further states that Defendant UNC-G refused to convene the Honor

15

Court for the purpose of Plaintiff being able to challenge his "unfair and arbitrary dismissal." Plaintiff points to statistics he compiled of graduation rates from the NAP to show that the program is also biased against male students. Plaintiff also quotes Defendant Ouellette as saying during a meeting concerning Plaintiff's status, "I don't know how we can help him." Plaintiff emphasizes the fact that Ouellette uses the word "him" to show that she suffered from a gender bias.

As previously stated, the claims remaining against Defendants after their first Motions to Dismiss were these: Title IX, breach of contract, and violation of New York Executive Law § 290-298 against Defendants Wake Forest and UNC-G, and a single claim of violation of New York Executive Law § 290-298 against Defendant Ouellette. The Court will first consider Defendant UNC-G's Motion to Dismiss in Part [Document #48] and Defendant Wake Forest's Motion for Partial Judgment on the Pleadings [Document #62]. The Court will then consider the Motions for Summary Judgment filed by the various Defendants.

IV.  MOTIONS TO DISMISS

Defendant UNC-G has filed a motion under Rule 12(b)(6) for dismissal concerning Plaintiff's claims of breach of contract and violation of New York Executive Law § 290-298. Defendant Wake Forest has also filed a motion under Rule 12(b)(6) for dismissal, but solely concerning New York Executive Law § 290-298. With respect to a motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted, dismissals are allowed "only in very limited circumstances." Rogers v. Jefferson-Pilot Life Ins. Co., 883 F.2d

324, 325 (4th Cir. 1989). Generally, "[a] court may dismiss a complaint only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations." Swierkiewicz v. Sorema N.A., 534 U.S. 506, 514, 122 S. Ct. 992, 998 (2002) (internal quotations omitted); accord Mylan Labs., Inc. v. Matkari, 7 F.3d 1130, 1134 (4th Cir. 1993). In making this determination, a court must view the complaint in the light most favorable to the plaintiff, accepting as true all well-pleaded factual allegations. Randall v. United States, 30 F.3d 518, 522 (4th Cir. 1994). Thus, the purpose of a motion to dismiss is to test the legal sufficiency of the complaint and not the facts that support it. Neitzke v. Williams, 490 U.S. 319, 326–27, 109 S. Ct. 1827, 1832 (1989). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Revene v. Charles County Comm'rs, 882 F.2d 870, 872 (4th Cir. 1989)(internal quotations omitted).

A.     Defendant UNC-G's Motion To Dismiss Based Upon Eleventh Amendment Immunity

Defendant UNC-G filed a Motion to Dismiss [Document #48] Plaintiff's claims of breach of contract and New York Executive Law § 290-298. Defendant UNC-G argues that, as a state agency, the Eleventh Amendment[8] bars Plaintiff's breach of contract and New York statutory law claims. More specifically, UNC-G cites to Bryant v. Locklear, 947 F. Supp. 915, 916 (E.D.N.C. 1996), in which the court found that the University of North Carolina constituted

_____

[8] The Eleventh Amendment of the U.S. Constitution states as follows: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

17

a state agency, and to <u>Huang v. Board of Governors of University of North Carolina</u>, 902 F.2d 1134, 1138 (4th Cir. 1990), in which the court found that the Eleventh Amendment barred claims against the Board of Trustees of the University of North Carolina. The Court agrees that Plaintiff's claims of breach of contract and New York Executive Law § 290-298 against UNC-G are barred by the Eleventh Amendment. Accordingly, these claims against Defendant UNC-G are DISMISSED.

      B.     Defendant Wake Forest's Motion For Partial Judgment On The Pleadings

Defendant Wake Forest filed a Motion for Partial Judgment on the Pleadings [Document #62] solely as to Plaintiff's claim under New York Executive Law § 290-298. Defendant Wake Forest notes that Plaintiff states in his Complaint that "[t]his is an action arising under the laws of the State of New York in particular Article 15 of Executive Law § 296, 298" and "[c]laims also stated under Executive law of the State of New York against the individual defendants." Defendant Wake Forest argues that this statement, "the individual defendants," in particular, shows that Plaintiff did not intend to bring this claim against Wake Forest, but in fact only brought the claim against Defendant Ouellette, an individual.

The Court notes that it must construe Plaintiff's Complaint liberally. Therefore, the Court will not dismiss Plaintiff's claim under New York Executive Law § 290-298 against Defendant Wake Forest on this basis. Accordingly, Defendant Wake Forest's Motion for Partial Judgment on the Pleadings [Document #62] is DENIED.

Therefore, moving forward prior to the Court's consideration of the Motions for

Summary Judgment are Plaintiff's Title IX claims against Defendants UNC-G and Wake Forest, a breach of contract claim against Wake Forest, and a claim under New York Executive Law § 290-298 against Wake Forest and Ouellette.

## V.    DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

### A.    Standard of Review

Summary judgment is appropriate when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  A fact is considered "material" if it "might affect the outcome of the suit under the governing law . . . ."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 2510, 91 L. Ed. 2d 202 (1986).  There can be "no genuine issue as to any material fact" if the non-moving party fails to "make a showing sufficient to establish the existence of an element essential to that party's case," since "a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial."  Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986).  Under this standard, a genuine issue of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson, 477 U.S. at 248, 106 S. Ct. at 2510.  As a result, the Court will only enter summary judgment in favor of the moving party when " 'the entire record shows a right to judgment with such clarity as to leave no room for controversy and establishes affirmatively that the [nonmoving] party cannot prevail under any circumstances.' "  Campbell v. Hewitt, Coleman & Assocs., 21 F.3d 52, 55 (4th Cir. 1994) (quoting Phoenix Sav. & Loan, Inc.

v. Aetna Cas. & Sur. Co., 381 F.2d 245, 249 (4th Cir. 1967)).

When ruling on a summary judgment motion, the Court "view[s] the evidence in the light most favorable to the non-moving party, granting that party the benefit of all reasonable inferences." Bailey v. Blue Cross & Blue Shield, 67 F.3d 53, 56 (4th Cir. 1995). The moving party bears the initial "burden of establishing that there is no genuine issue as to any material fact and that he is entitled to judgment as a matter of law." Catawba Indian Tribe v. South Carolina, 978 F.2d 1334, 1339 (4th Cir. 1992) (en banc). Once the moving party has met this burden, the nonmoving party must set forth specific facts showing that there is a genuine issue for trial. Id. In so doing, the nonmoving party may not rest on mere allegations, denials, or unsupported assertions, but must, through affidavits or otherwise, provide evidence of a genuine dispute. Anderson, 477 U.S. at 248–49, 106 S. Ct. at 2510; Catawba Indian Tribe, 978 F.2d at 1339. In other words, the nonmoving party must show "more than . . . some metaphysical doubt as to the material facts," for the mere existence of a scintilla of evidence in support of its position is insufficient to survive summary judgment. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 1356, 89 L. Ed. 2d 538 (1986); Catawba Indian Tribe, 978 F.2d at 1339.

In addition, "[w]hile courts must take special care when considering a motion for summary judgment in a discrimination case because motive is often the critical issue, summary judgment disposition remains appropriate if the plaintiff cannot prevail as a matter of law." Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 958-59 (4th Cir. 1996). Based on this

20

standard, the Court will first consider the claims brought by Plaintiff for gender discrimination in violation of Title IX.

B.     Plaintiff's Claim Of Discrimination Under Title IX

Title IX provides in pertinent part that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance . . . ." 20 U.S.C. § 1681(a). In many discrimination cases, because there are fewer cases concerning Title IX, courts have applied the judicial interpretations of Title VII as to Title IX claims. See Preston v. Virginia ex rel. New River Community College, 31 F.3d 203, 207 (4th Cir. 1994); Brine v. University of Iowa, 90 F.3d 271, 276 (8th Cir. 1996). Therefore, in order for Plaintiff to prevail in this Title IX case, Plaintiff must show that he "was the victim of intentional discrimination." Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 286 (4th Cir. 2004). Because Plaintiff has not put forth any direct evidence of gender discrimination, the Court will look to the familiar burden-shifting proof scheme created by the U.S. Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S. Ct. 1817 (1973). Under this scheme, a plaintiff must first establish a *prima facie* case. Thereafter, the defendant has the burden to rebut the presumption of discrimination by producing evidence that the plaintiff suffered an adverse consequence for a legitimate, non-discriminatory reason. See Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254, 101 S. Ct. 1089, 1094 (1981). If the defendant provides such a legitimate, non-discriminatory reason, the plaintiff's inference of discrimination drops out of the

21

case and the ultimate burden remains on the plaintiff to show that the proffered reason is mere pretext for actual discrimination. Id. at 255-56, 101 S. Ct. at 1095.

In this case, for Plaintiff to make out a *prima facie* case of gender discrimination, he must show that (1) he is within a class protected by Title VII, (2) he was performing as an SRNA at a level that met Wake Forest's legitimate expectations, (3) he was nevertheless dismissed from the NAP, and (4) that others not in the protected class were treated more favorably. See Lipsett v. University of Puerto Rico, 864 F.2d 881, 899 (1st Cir. 1988) (applying Title VII law to a Title IX claim in which plaintiff was both a student and an employee); see also Andriakos v. University of Southern Indiana, 867 F. Supp. 804, 811 (S.D. Ind. 1992) (applying Title VII law to case of male nursing student alleging sex discrimination under Title IX).

The Court finds that, taking the facts in a light most favorable to Plaintiff, that he cannot show that he was performing at a level that met Defendant Wake Forest's legitimate expectations.[9]  More specifically, the admissible facts in this matter show that Defendant Ouellette had serious concerns about Plaintiff's performance and progress both in the Spring of 2000, when Plaintiff came close to a dismissal based upon poor performance in his didactic classes at UNC-G, and again in the Fall of 2000, when Plaintiff admitted that he placed a patient in

---

[9] Nor can Plaintiff show that he met UNC-G's legitimate expectations, because Plaintiff was expected to remain in good standing at Wake Forest in order to continue with the academic component at UNC-G.  Moreover, the Court finds that Plaintiff puts forward no evidence that UNC-G subjected Plaintiff to a hostile educational environment based upon his gender, and in fact UNC-G offered Plaintiff the opportunity to either rejoin the NAP after a semester absence or to choose a different nursing concentration.  Plaintiff chose to do neither.

22

jeopardy by failing to properly check an anesthesia machine. In response to these factual statements by Defendants, Plaintiff puts forward mere conjecture that Defendant Ouellette had manipulated his grades and that an instructor had purposefully altered the anesthesia machine in order to make Plaintiff fail.

The Court also finds that Plaintiff does not show that younger, female nursing students were treated more favorably than he was treated. Plaintiff has filed no affidavits from any of his fellow nursing students. He has failed to show that any similarly situated female students with clinical deficiencies as severe as his were brought before the Executive Committee, or that any similarly situated female students were given remediation. Plaintiff responds by asserting that at least one female student was given extra time to learn intubation. However, the only admissible evidence before the Court suggests that intubation is an advanced skill, in contrast to Plaintiff's alleged difficulties which centered around basic nursing and safety skills, such as charting, general preparations prior to surgery, and calculating drug dosages. (Def. Wake Forest's Mot. Summ. J., Appendix, Document #90, Ex. 1.) Moreover, the Court finds that even if the skill deficiencies between Plaintiff and the female student he identified were equal, Plaintiff's only proposed remediation, that is, to be placed on rotation only with certain CRNAs, was not a remediation offered to any other student. Accordingly, because Plaintiff cannot show either that he was performing at a level that met Defendant Wake Forest's or UNC-G's legitimate expectations, nor can he show that similarly situated female students were treated more favorably, the Court finds that Plaintiff's claims of discrimination under Title IX must be

23

DISMISSED and Summary Judgment in favor of the Defendants is GRANTED.[10]

C.      Plaintiff's Claim of Breach of Contract Against Defendant Wake Forest

As the Court previously discussed, Plaintiff's claim of breach of contract remains solely against Defendant Wake Forest.  Plaintiff's breach of contract claim is apparently based upon the New York Department of Labor Application for Training ("TAA Application").  The Court has considered the TAA Application and does not find that this "contract" required Defendant Wake Forest to graduate Plaintiff regardless of his clinical skills or academic performance.  Instead, the TAA Application only requires Defendant Wake Forest to (1) have a curriculum approved by the U.S. Department of Education, (2) provide training on a non-discriminatory basis, (3) bill training costs not in excess of certain limits, and (4) comply with standards for training set up by the Southern Association of Colleges and Schools.  Moreover, the TAA Application requires Plaintiff to (1) regularly attend scheduled classes, (2) abide by rules and regulations of the training facility, (3) make a good faith effort to satisfactorily complete this training, (4) notify the New York Department of Labor before any changes are made in this training program, and (5) immediately notify the Department of Labor and the school in writing if he intends to drop out. This purported "contract" does not, by its very terms, require Defendant Wake Forest to

_____

[10] Because of this finding by the Court, that is, that Plaintiff cannot make out a *prima facie* case of gender discrimination, the Court need not consider whether Plaintiff could show that Defendants' legitimate, non-discriminatory reason for dismissing Plaintiff from the program was mere pretext.  However, were the Court to consider this issue, the Court would find that Plaintiff has not shown any evidence of pretext in this case that he was not, in fact, dismissed because of continual clinical inadequacies.

24

graduate Plaintiff, and instead considers situations where such an event would not occur, such as if Plaintiff does not make a good faith effort to satisfactorily complete this training. Plaintiff has presented no evidence to the Court that the TAA Application is a binding contract requiring Defendant Wake Forest to graduate Plaintiff from the NAP, and this Court also finds none. Accordingly, Plaintiff's claim of breach of contract against Defendant Wake Forest is DISMISSED.

> D. Plaintiff's Claim Under New York Executive Law § 290-298 Against Defendants Wake Forest and Ouellette

Finally, Plaintiff purports to bring a claim against Defendants Wake Forest and Ouellette for violating New York's Human Rights Law, that is, New York Executive Law § 290-298. Plaintiff is a citizen of New York. Defendants Wake Forest and Ouellette are citizens of North Carolina. The New York State Human Rights Law ("NYSHRL") provides in pertinent part that it applies to acts "committed outside this state against a resident of this state . . . if such act would constitute an unlawful discriminatory practice if committed within this state." N.Y. Exec. L. § 298-a(1). However, this law has been interpreted by New York courts as *not* providing "a cause of action to a New York resident for discriminatory acts committed outside of New York by a foreign corporation." Curto v. Med. World Communs., Inc., 388 F. Supp. 2d 101, 106 (E.D.N.Y. 2005). In such a case, a plaintiff's remedies are restricted to an administrative action before the New York State Division of Human Rights. See Sherwood v. Olin Corp., 772 F. Supp. 1418, 1421 (S.D.N.Y. 1991). Plaintiff has failed to make any showing that any alleged discriminatory

act by Defendants occurred in the State of New York. Accordingly, this Court finds it has no jurisdiction over this claim by Plaintiff against Defendants Wake Forest and Ouellette, and it is also DISMISSED.

VI. CONCLUSION

For the reasons stated herein, Defendants' Motions to Strike [Documents #71, #72] Plaintiff's Amended Complaint [Document #70] are GRANTED and the Clerk of Court is instructed to STRIKE this Document from the Record. Plaintiff's Motion to Toll and Provide Equitable Relief [Document #50] is DENIED. Plaintiff's Motion to Allow Plaintiff to Resubmit Oppositions [Document #101] is GRANTED. Defendants' Motions to Strike [Documents #94, #96] Plaintiff's audio recordings and transcript of such recordings, Plaintiff's addendum to his Deposition, and other hearsay served with Plaintiff's Response to the Motions for Summary Judgment are GRANTED and the Clerk of Court is instructed to STRIKE these Documents from the Record. Defendant UNC-G's Motion to Dismiss in Part [Document #48] is GRANTED. Defendant Wake Forest's Motion for Partial Judgment on the Pleadings [Document #62] is DENIED. However, Defendants' Motions for Summary Judgment [Documents #80, #89] are GRANTED. This case is therefore DISMISSED WITH PREJUDICE in its entirety.

An Order and Judgment consistent with this Memorandum Opinion will be filed contemporaneously herewith.

This, the 15th day of March, 2006.

United States District Judge